UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

EASTERN POTATO DEALERS, INC.,

                              Plaintiff,

          v.

TNC PACKING CORP., et al.,

                    Defendants.

---

DECISION AND ORDER

08-CV-6280 CJS

APPEARANCES

| | |
|---|---|
| For Cambridge Farms, Inc., H.C. Schmieding Produce, Inc., and E.K. Bare & Sons, Inc.: | Bruce Levinson, Esq. 747 Third Avenue, Fourth Floor New York, New York 10017-2803 |
| For Lacy Katzen LLP: | David MacKnight, Esq. Lacy Katzen, LLP 130 East Main Street Rochester, New York 14604 |
| For Dibble & Miller, P.C.: | Gerard F. Norton, Jr. Dibble & Miller, P.C. 55 Canterbury Road Rochester, New York 14607-3436 |
| For David Shults and Barbara L.S. Finch: | Michael R. Wolford Esq. Sarah Snyder Merkel, Esq. The Wolford Law Firm LLP 16 East Main Street 600 Reynolds Arcade Building Rochester, New York 14614 |

1

INTRODUCTION

This is an action brought pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq*.  Now before the Court are the following applications: 1) a motion (Docket No. [#29]) by Dibble & Miller to vacate or modify a Stipulation and Order [#3] of settlement in this action dated July 15, 2008, pursuant to Federal Rule of Civil Procedure ("FRCP") 60(b), and for an accounting; 2) a motion [#61] by David Shults and Barbara L.S. Finch to intervene in this action; 3) a motion [#67] by the law firm of Lacy Katzen to intervene in this action and to obtain payment of money held in the Court's registry; and 4) a motion [#74] by Cambridge Farms, Inc., H.C. Schmieding Produce, Inc., and E.K. Bare & Sons, Inc., for an order directing payment to them of money held in the Court's registry.  For reasons discussed below, the motions to intervene are granted, Dibble & Miller's motion to vacate the Stipulation and Order is granted, and the motions for payment are denied.

BACKGROUND

This case has an unusually complicated history, which begins in 2003.  Prior to 2003, Thomas Case ("Case") and his brother Antone Case ("Antone") were partners in the Case Brothers Partnership, a potato farming operation.  In 2003, the brothers acrimoniously dissolved the partnership, and Case sued Antone in New York State Supreme Court, Livingston County, in an action entitled *Thomas V. Case v. Antone R. Case, et al.*, Index No. 297-2003 ("the Case Brothers litigation").  The Honorable Gerard Alonzo, Livingston County Court Judge, appointed John J. Considine, Jr., Esq. ("Considine") as receiver of the partnership's property.

Case was initially represented in the Case Brothers litigation by the law firm of

2

Phillips Lytle LLP ("Phillips Lytle").  In March 2004, Case also retained the law firm of

Dibble & Miller ("Dibble & Miller") to handle certain tax matters before the Internal

Revenue Service ("IRS").  According to Case, he paid Dibble & Miller in full for its

handling of those tax matters, which were separate from the Case Brothers state-court

litigation.

 While the Case Brothers litigation was pending, Case and his wife, Nancy Case,

formed a corporation entitled TNC Packing Corporation ("TNC"), a potato packaging

company.  Case also formed another company, Buffalo Sixty Three, LLC ("Buffalo 63").

In connection with this new potato-packaging venture, TNC and Buffalo 63 purchased

real property and equipment.[1]  To obtain the necessary financing, Case borrowed

approximately $260,000.00 from David Shults, Esq. ("Shults"), an attorney in Hornell,

New York, and Shults's sister, Barbara L.S. Finch ("Finch").  Case provided various

security to Shults and Finch for the loan.  For example, on June 27, 2005, Case

executed security agreements, giving Shults and Finch a security interest in all of the

accounts, inventory, and equipment owned by Case, TNC, and Buffalo 63.  Further, on

November 9, 2005, Case gave Shults and Finch a mortgage on real property owned by

Buffalo 63.

 TNC soon ran into problems with creditors.  Between December 12, 2005 and

January 26, 2006, TNC purchased $31,186.57 worth of produce from Eastern Potato

Dealers, Inc. ("Eastern Potato") on credit, but then failed to pay.  TNC also failed to pay

at least three other agricultural producers for their products:  Cambridge Farms, Inc.

---

[1]Case purchased the property and equipment from Considine, as receiver of the Case Brothers
partnership property.

("Cambridge"), H.C. Schmieding Produce, Inc. ("Schmieding"), and E.K. Bare & Sons, Inc. ("Bare").  On the present record, the exact date when TNC incurred these debts to Cambridge, Schmieding, and Bare is unclear.

Because of various financial problems involving TNC, Case retained David MacKnight ("MacKnight"), of the law firm of Lacy Katzen LLP ("Lacy Katzen") to represent him, TNC, and Buffalo 63, in connection with these debts.  MacKnight had some knowledge of PACA, and believed that the assets of Case, TNC, and Buffalo 63, were subject to PACA claims.  MacKnight was also aware that Case had an interest in the Case Brothers litigation, which interest MacKnight did not believe was subject to PACA claims, since the partnership was dissolved prior to TNC being formed. MacKnight believed that TNC could be profitable if he could keep the creditors at bay, including Shults.  In that regard, Shults had threatened to "pull the plug" on TNC and Buffalo 63, "because of his perception that TNC's business failure was inevitable." MacKnight Aff. ¶ 15.  MacKnight therefore decided that "the initial step" in saving TNC was to urge Shults and Finch not to pursue foreclosure on their security interests. *Id*. at ¶ 17.  In that regard, MacKnight informed Shults that Shults' and Finch's security interests might not be too secure, since the property of Case, TNC and Buffalo 63 was subject to PACA claims, which would have priority.  MacKnight advised Shults that he would be better off taking a security interest in Case's share of the Case Brother's litigation proceeds, since such money was *not* subject to PACA claims.  Subsequently, on February 2, 2006, Case gave Shults and Finch an Assignment of Interest, covering all of Case's anticipated share of the proceeds from the Case Brothers litigation.  In that regard, Case assigned to Shults and Finch,

4

1. All the right, title, interest in and to all proceeds from the dissolution of Case Bros. partnership.

2. All the right, title, interest in and to all proceeds in an action entitled *Case v. Case*, Livingston County Index Number: 297-2003.

3. All the right, title, interest in and all proceeds received from John J. Considine, Jr., Receiver appointed in the action entitled *Case v. Case*, Livingston County Index Number: 297-2003.

4. All the right, title and interest in and to Case Bros. Partnership.

Shults Affidavit, ¶ 5.  On February 9, 2006, Shults filed this assignment with the Livingston County Clerk.  In addition to getting Shults and Finch to "stand still,"[2] MacKnight also urged TNC's PACA creditors not to file PACA claims against TNC, since doing so could have resulted in the loss of TNC's license to do business.[3]

Meanwhile, Phillips Lytle continued to represent Case in the Case Brothers litigation until March 2006, when the firm moved to withdraw from representing Case.[4] On May 3, 2006, the Honorable Gail A. Donofrio, Acting Supreme Court Justice, entered an Order in the Case Brothers litigation, granting Phillips Lytle's motion to withdraw as counsel, and granting Phillips Lytle a charging lien on any proceeds of the action, stating in pertinent part:

---

[2]MacKnight Aff. ¶ 22.

[3]*See, e.g., American Banana Co., Inc. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d 33, 36, n. 2 (2d Cir. 2004); *see also, id*. at 38 ("The sellers' prompt resort to [PACA's] administrative remedies was intended to isolate and to put pressure on financially insecure buyers to meet their obligations or to be forced from the business.").

[4]Phillips Lytle was upset because Case was not paying them, and because Case had, without their knowledge, given Shults a security interest in his entire share of the partnership proceeds. See, Snyder-Merkel Aff., Exhibit 3.

> Ordered, that Phillips Lytle LLP be granted a charging lien on the
> proceeds of any recovery, judgment or settlement pending the outcome of
> this action, provided that the aforesaid lien of Phillips Lytle LLP shall be
> second and subordinate to the charging lien and the retaining lien of any
> new counsel secured by Plaintiff [Case]; and
>
> ***
>
> Ordered that compensation to Phillips Lytle LLP for legal services, costs,
> and disbursements shall be made upon application and hearing before
> this court upon the conclusion of this action by judgment, settlement or
> otherwise and shall, subject to the subordination required by paragraph 3
> hereof, be paid solely out of the proceeds of any recovery, judgment or
> settlement due Plaintiff, if any.

Affidavit of David A. Shults, Exhibit G.  Case subsequently retained Dibble & Miller to replace Phillips Lytle as his attorneys in the Case Brothers litigation.

Subsequently, TNC's business failed, despite MacKnight's efforts to rehabilitate the business and see that creditors were paid. Sometime prior to November 2006, Eastern Potato filed a PACA complaint against TNC with the U.S. Secretary of Agriculture.  On November 14, 2006, the Secretary of Agriculture issued an Order awarding Eastern Potato "$31,186.57 plus interest at the rate of 5.03% per annum from March 1, 2006, plus $300.00." Complaint ¶ 12.  However, TNC did not pay Eastern Potato.

At around this time, MacKnight and Case were apparently interested in finding a way to pay the various PACA creditors.  Apart from the assets of TNC and Buffalo 63, though, the only asset that Case had to pay such creditors was his expected share of the Case Brothers partnership litigation.  As indicated above, however, MacKnight had already concluded that such property was not PACA trust property.  Additionally, Case had already assigned his interest in that litigation to Shults and Finch.  Nonetheless,

6

MacKnight had Case more carefully examine his financial records, to determine whether any TNC money could be connected to Case's expected share of the Case Brothers litigation.  In that regard, MacKnight believed, and still maintains, that if *any* TNC money could be connected to the Case Brothers partnership property, then all of the partnership property would be subject to PACA claims.[5]  Following Case's examination of his records, he determined that he had used $25,250.00 of TNC money in connection with the Case Brothers litigation.  Specifically, Case paid Dibble & Miller a $25,000.00 retainer and $250.00 for disbursements, using TNC funds.  Such money was never commingled with the partnership property in Considine's custody, but was paid directly to Dibble & Miller.  Upon learning that Case had used $25,250.00 of TNC property to pay Dibble & Miller in connection with the Case Brothers litigation, MacKnight apparently convinced Shults that all of Case's expected share of the partnership assets, which Case had assigned to Shults and Finch, was subject to superior PACA claims.

   In early May 2008, the trial in the Case Brothers litigation began before Judge Alonzo.  During the trial, the relationship between Case and Dibble & Miller turned sour, though they disagree as to why that happened.  Case contends, for example, that Dibble & Miller forced him to agree to an increase in the firm's hourly rate, and then browbeat him into accepting an unfavorable settlement. Norton Reply Aff., Exhibit K. Case also maintains that Dibble & Miller failed to include a non-disparagement clause

---

   [5]As mentioned earlier, MacKnight was previously so convinced that the Case Brothers partnership property was not subject to PACA claims that he advised Shults to take a security interest in Case's share of that property.

in the proposed settlement order, contrary to his wishes.  On the other hand, Dibble &

Miller contends that Case had an unrealistic sense of the value of his claim, inasmuch

as Case had taken far more money from the partnership than Antone during the period

prior to the dissolution.  Dibble & Miller further contends that Case unfairly demanded

that the firm reduce its fee.  In any event, shortly after the trial began Case agreed to

settle the case against his brother.  The actual share that Case would receive, however,

was subject to Considine submitting his accounting for the Court's review.[6]

On June 26, 2008, Eastern Potato commenced this PACA action against TNC,

Case, and Case's wife, Nancy Case.  The Complaint alleged that Case and Mrs. Case

were the principals of TNC.  Further, the Complaint recited the fact that between

December 12, 2005 and January 26, 2006, Eastern Potato sold and delivered

$31,186.57 worth of produce to TNC, for which TNC later refused to pay, and that on

November 14, 2006, the Secretary of Agriculture issued an Order awarding Eastern

Potato "$31,186.57 plus interest at the rate of 5.03% per annum from March 1, 2006,

plus $300.00." Complaint ¶ 12.   The attorney for Eastern Potato was Bruce Levinson,

Esq. ("Levinson").

By the time this action commenced, Case, MacKnight, and Shults had apparently

decided to liquidate TNC and Buffalo 63.  On June 28, 2006, an auction was conducted

to sell personal property belonging to Case, Mrs. Case, and TNC.  According to

MacKnight, the auction resulted in proceeds of approximately one hundred twenty

---

[6]On or about May 21, 2008, Shults notified Considine, as Receiver, that he and Finch were owed
approximately $311,858.46 by Case, which amount was secured, in part, by the aforementioned
assignment of Case's interest in the Case Brothers litigation proceeds.

thousand dollars ($120,000.00).  From these auction proceeds, MacKnight and Lacy Katzen were paid eight thousand dollars ($8,000.00) for legal services.

Around this same time, MacKnight, Shults, and Levinson began exploring a global settlement of the various claims involving Case and TNC.  In this regard, as discussed above, MacKnight and Shults were working under at least two assumptions: 1) that all of Case's expected share from the Case Brothers litigation was subject to PACA claims; and 2) that such PACA claims would have priority over Shults' and Finch's security interests.  Shults informed Levinson of the loans that Shults and Finch had made to Case, and of the security interests that Case had given to secure the debt. According to MacKnight, Levinson demanded, as part of a settlement, that the Case Brothers partnership assets be designated as a PACA trust asset. MacKnight Aff. ¶ 32.[7]

 According to Shults, "Levinson was receptive to a settlement as were the defendants and as a result, we entered into a Stipulation drafted by Mr. Levinson which provided that [Finch] and I would recover 78% of the proceeds of the partnership dissolution and the [expected] sale of real property [owned by Buffalo 63] and equipment that had been purchased by Mr. Case with the funds borrowed from [Finch] and me.  Mr. Levinson's clients would take 22%." Shults Aff. at ¶ 10.  By that point, Levinson's clients included Eastern Potato, Cambridge, Schmieding, and Bare, though only Eastern Potato was named as a plaintiff in the Complaint.[8]  During the time that these settlement

---

[7]Curiously, though, as discussed herein, Levinson agreed, as part of the settlement, that the vast majority of the so-called PACA trust fund would be paid to Shults and Finch, who clearly were not PACA creditors.

[8]Levinson no longer represents Eastern Potato.  On July 7, 2010, the Honorable Marian W. Payson granted Levinson's motion to withdraw as counsel. (Docket No. [#49]).  In that Order, Judge Payson advised Eastern Potato that a corporation cannot proceed *pro se*, and that Eastern Potato had to

discussions were occurring, Dibble & Miller was unaware of this lawsuit.

Six days after this action was commenced, on July 2, 2008, Eastern, Cambridge, Schmieding, Bare, TNC, Case, Mrs. Case, Shults, Finch, and MacKnight/Lacy Katzen, entered into a stipulation of settlement.  The stipulation describes Cambridge, Schmieding, and Bare as Plaintiffs, even though they were not included in the original Complaint and no Amended Complaint has ever been filed.  On the other hand, Shults and Finch are described in the agreement as "non-parties."

The settlement agreement recites that Defendants (TNC, Case, and Mrs. Case) owe Eastern, Cambridge, Schmieding, and Bare ("Plaintiffs"), the following amounts under PACA:  1) Eastern $40,118.18; 2) Cambridge $18,410.26; 3) Schmieding $21,453.40; and 4) Bare $24,954.15.  The total of these amounts is $104,935.99., plus interest.  The settlement agreement further indicates that Defendants owed Shults and Finch $259,195.65.  The agreement states that Defendants will pay these debts from the following sources: 1) the sale of TNC's assets; 2) the sale of real property belong to Buffalo 63; and 3) Case's share of the Case Brothers litigation proceeds.  The settlement agreement describes all of these assets as "PACA trust assets."[9]

With regard to Case's share of the Case Brothers litigation, the settlement agreement further states:

Thomas Case has entered into a settlement agreement, the terms of

---

retain a new attorney within thirty days, or the case could be dismissed. *Id.*  Eastern Potato has never retained new counsel, despite the passage of almost a year.  Consequently, Eastern Potato's claims are dismissed.

[9]Actually, the agreement states that Considine was holding Case Brothers partnership assets totaling at least $620,000.00 in escrow, and that all of those assets were PACA trust assets, not just Case's share.

> which have been disclosed to the parties, which settlement agreement
> has not been reduced to a writing signed by Thomas Case. *The*
> *settlement proceeds are subject to attorney's charging lien claims in*
> *disputed amounts which Thomas Case seeks to settle*.

Stipulated Order [#3] at ¶ 10(h) (emphasis added). The Court understands such

statement to refer to the fact that Dibble & Miller was claiming to be entitled to legal

fees from Case's share of the partnership settlement in the state-court action. The

stipulation does not expressly mention Dibble & Miller, nor does it provide for any

payment to Dibble & Miller. The stipulation states, though, that Case's share of the

escrow funds is encumbered by an $8,000.00 debt to Lacy Katzen, whom the

stipulation describes as a secured creditor.[10]

The stipulation then states that the so-called PACA trust assets will be paid over

to "Plaintiffs" (Eastern, Cambridge, Schmieding, and Bare), Shults, Finch, and Lacy

Katzen, as follows:

> 17. Notwithstanding any other provision of this Stipulation, plaintiffs
> acknowledge the Shults claim that Shults' interest in the Escrow Funds,
> the Land Proceeds and Auction Proceeds pre-dated creation of any
> PACA trust obligations. Plaintiffs do not admit that the Shults' [sic] claim
> is correct, however to avoid the cost, time and uncertainty of litigation, the
> parties and Shults agree as follows:
>
> (a) Subject to subjection (f) of this paragraph 17, the Escrow Fund, the
> Land Proceeds and the Auction Proceeds shall be distributed as follows:
> (I) the sum of $8,000.00 shall be distributed to Lacey & Katzen LLP,
> attorneys for defendant, [sic] as full and complete satisfaction of claims
> against Shults and plaintiffs, then (ii) to plaintiffs and Shults pari passu,
> with Shults receiving 78% of the first combined $331,665.35

---

[10]As mentioned above, Lacy Katzen had already received such payment from the auction
proceeds.

[$258,698.97] contained in the Escrow Fund, the Land Proceeds and the Auction Proceeds, and plaintiffs receiving the remaining 22% [$72,966.38].

(b) If there are any monies remaining in the Escrow Fund, the Land Proceeds and the Auction Proceeds after payment of the amounts set forth in subparagraph (a) of  paragraph 17, then plaintiffs and Shults shall share in the next monies payable therefrom, pari passu, in the same percentages until Shults and plaintiffs receive all interest on the principal amounts they are owed.

(c) If there are any monies remaining in the Escrow Fund, the Land Proceeds and Auction Proceeds after payment of the amounts set forth in subparagraphs (a) and (b) of this paragraph 17, then plaintiffs and Shults shall share equally in the next monies available therefrom, pari passu, until Plaintiffs and Shults have each received $10,000.00 as and for legal fees.

(d) Thereafter, plaintiffs shall be entitled to next monies payable from the Escrow Fund, the Land Proceeds and the Auction Proceeds, ahead of any and all other claimants, until the Settlement Amount has been paid in full.

(e) Any enforcement by plaintiffs or Shults of the judgment herein shall be subject to this paragraph.

(f) Notwithstanding any other provision of this paragraph 17, Shults shall be entitled to reimbursement for monies expended by him subsequent to the date of this Agreement for taxes and insurance so as to preserve the Land for sale, which reimbursement shall be paid prior to the sums set forth in paragraph 17(a) herein.

(g) After Shults and Plaintiffs have been paid in full, the remaining proceeds shall bepaid to Thomas Case, subject to whatever claims Lacy Katzen LLP may have as a secured creditor.

18. Defendants shall cause the Auction Proceeds to be delivered by the

> auctioneer, net only of the auctioneer's fee, directly to David Shults, Esq.,
> as Escrowee. David Shults, Esq.shall also retain the Land Proceeds as
> escrowee. David Schults, Esq. shall hold the Auction Proceeds and Land
> Proceeds in escrow and only release the funds in accordance with this
> Stipulation, or as directed by this Court. In the event that Defendants'
> attorney receives any portion of Auction Proceeds or the Land Proceeds,
> such proceeds shall be delivered in the form received, endorsed without
> recourse to David Shults, Esq.

(Docket No. [#3]).  To summarize, the settlement agreement provides for the payment of

the total amount of $339,665.35 to Lacy Katzen, "Plaintiffs," Shults, and Finch, as and for

the legal fees owed to Lacy Katzen and the principal amounts owed to the others.  The

agreement further states that any additional money will be divided 78%/22% between

Plaintiffs and Shults/Finch, for interest on the principal amounts.  In addition, the

agreement states that any further money would be divided 78%/22% between Plaintiffs

and Shults/Finch, until each received $10,000.00 for legal costs.

On July 15, 2008, Judge Telesca granted the parties' joint application and approved

the stipulated settlement.  Significantly, at that point in time, Judge Telesca knew only that

the parties to the action before him were submitting a stipulated global settlement.  Judge

Telesca would not have known about the long and complicated history set forth above,

since the Court only learned of that from the papers submitted in connection with the

subject pending motions.  For example, Judge Telesca would not have known how the

parties came to take the position that Case's share of the partnership proceeds were

subject to PACA claims.  Judge Telesca also would not have had any notice of the fee

dispute between Case and Dibble & Miller, except for the vague reference mentioned

above to "attorneys' charging lien claims" in the state court action.  In any event,

knowledge of the specifics of that fee dispute presumably would not have affected Judge

Telesca's decision to approve the settlement, since it would have been reasonable to assume that Dibble & Millers' fees would be addressed in the state-court action, prior to Case receiving his share of the partnership settlement.[11]

On July 17, 2008, two days after Judge Telesca "so ordered" the settlement agreement, Dibble & Miller wrote to Judge Telesca to object to the settlement.  Judge Telesca responded that he could not consider the objection, inasmuch as Dibble & Miller was not a party to the action.  Subsequently, Dibble & Miller apparently attempted to negotiate an agreement with MacKnight, Levinson, and Shults, without success.  On September 5, 2008, Dibble & Miller filed a motion [#4] to intervene in the action.  Dibble & Miller argued, as part of that application, that the Case Brothers partnership assets were not PACA trust funds, and that the settlement was a fraudulent attempt to prevent Dibble & Miller from collecting its legal fees.  The parties to the stipulation opposed Dibble & Millers motion, and moved for entry of judgment on the stipulated order.  On April 21, 2009, Judge Telesca denied Dibble & Miller's motion to intervene, on the grounds that it was untimely, and granted judgment on the stipulated order.  On May 5, 2009, Dibble & Miller moved for reconsideration, and on June 17, 2009, Judge Telesca denied the application.   Dibble & Miller appealed that ruling to the United States Court of Appeals for the Second Circuit.

On May 4, 2009, Considine, as Receiver, submitted his account and final report in the Case Brothers litigation to the Supreme Court, Livingston County.  In a letter accompanying the report, Considine indicated that Dibble & Miller had a charging lien on Case's share of the settlement, and that Judge Alonzo would have to decide whether

---

[11] It appears that the participants in the state-court action had this understanding.  For example, on May 4, 2009, Considine wrote to Judge Alonzo, indicating, in pertinent part, his understanding that Dibble & Miller's attorney lien would be paid "from the share of Thomas V. Case" in the state-court litigation. *See*, Norton Reply Aff., Exhibit N.

14

Shults' and Finch's lien had priority over Dibble & Miller's lien.  *See*, Norton Reply Aff.,

Exhibit N  (Stating that $123,831.17 should be paid to Dibble & Miller or Shults and Finch,

and that Judge Alonzo "must decide whether the attorney's lien of the Dibble Miller law

office takes precedence over the lien of creditors David Shults and his sister, Barbara L.S.

Finch.").  On July 2, 2009, the Honorable Kenneth R. Fisher, Supreme  Court Justice, to

whom the case had apparently been transferred from Judge Alonzo, issued an Order

approving Considine's account and distributing the proceeds of the Case Brothers

partnership.  Justice Fisher determined that Case's share of the partnership was

$232,255.10.  Justice Fisher further noted that Levinson had made an application to have

Case's share paid directly to Levinson, to be distributed pursuant to Judge Telesca's

Stipulated Order, which application Dibble & Miller opposed.  Over Dibble & Miller's

objection, Justice Fisher directed that Case's share be paid to Levinson, stating:

> ORDERED, the . . . share belonging to Thomas V. Case shall be distributed
> pursuant to the Decision and Order of Judge Michael A. Telesca, United
> States District Court of Western District of New York, dated April 21, 2009,
> to the clients of Bruce Levinson and to David A. Shults and Barbara L.S.
> Finch as so provided in the Stipulation and Order[.]

Shults Aff., Exhibit F at p. 5.  Further, Justice Fisher denied Dibble & Millers' fee request,

stating: "ORDERED, the . . . share belonging to Thomas V. Case is a fund independent of

Dibble and Miller, *NYCTL 1996-1 Trust et al v. Weber*, 292 App Div 2d 576[.]" *Id*.  Dibble &

Miller appealed Justice Fisher's ruling to the New York State Supreme Court, Appellate

Division, Fourth Department, arguing that Dibble & Miller had an attorney's lien on Case's

share of the partnership assets.  Subsequently, Considine apparently paid Case's share of

the partnership assets to Levinson, who distributed the proceeds according to the

Stipulation and Order [#3] issued by Judge Telesca.

15

On January 27, 2010, while Dibble & Miller's appeal to the Appellate Division was pending, the United States Court of Appeals for the Second Circuit heard oral argument on Dibble & Miller's appeal.  Following oral argument, the Circuit Court ordered that all funds or property distributed pursuant to Judge Telesca's Stipulation and Order be paid to the Clerk of this Court, for safekeeping pending a determination of the parties' rights.  On February 4, 2010, the Circuit Court issued a Summary Order, reversing  Judge Telesca's Order denying Dibble & Miller's motion to intervene in this action, and remanding the case for further proceedings. *See, Eastern Potato Dealers, Inc. v. Dibble & Miller, P.C.*, 363 Fed.Appx. 819, 2010 WL 376807 (2d Cir. Feb. 4, 2010).  In that regard, the Circuit Court observed that the stipulated settlement was "signed a mere six days after this action was commenced," and

> purported to defeat appellant's charging lien[12] by characterizing Case's entire interest in the state court litigation as PACA trust property, which would give plaintiffs-appellees, who alleged that they were PACA creditors, priority over appellant's lien. However, the stipulation provided that the majority of the funds received as Case's interest in the state court litigation were to be used to pay non-parties [Shults and Finch], whose interest in the funds appears to be unrelated to the PACA debt that is the subject of this action.

*Id.*, 363 Fed.Appx. at 821, 2010 WL 376807 at *1.  Thus, the Circuit Court reversed the order denying Dibble & Miller's motion to intervene, but did not reverse or vacate Judge Telesca's Order approving the settlement.

On November 12, 2010, the Appellate Division, Fourth Department dismissed

---

[12]Whatever the intentions of the parties to the stipulation may have been, this Court respectfully observes that in fact, Judge Telesca's Stipulated Order did not "purport" to defeat Dibble & Miller's charging lien.  Instead, as discussed above, the order merely acknowledged the existence of a disputed attorney's charging lien, which presumably would have been dealt with in the state-court action before Case ever received his share of the settlement proceeds from that action.

Dibble & Miller's appeal of Justice Fisher's ruling.  The Appellate Division's memorandum decision stated:

> Plaintiff and his attorneys, Dibble & Miller, P.C. (appellant), appeal from, *inter alia*, that part of an order directing the distribution of plaintiff's share of post-accounting income in a partnership dissolution proceeding to plaintiff's nonparty creditors pursuant to an order of the United States District Court for the Western District of New York, despite the existence of an attorney's lien filed by appellant. Following the filing of a notice of appeal in this matter, however, the United States Court of Appeals for the Second Circuit reversed the order of the District Court denying appellant's motion to intervene in the federal matter, ordered that the funds at issue be held by the clerk of the District Court and remanded the matter to the District Court for further proceedings (*see Eastern Potato Dealers, Inc. v. TNC Packing Corp.*, 363 Fed.Appx. 819, 822). We thus note that all of the necessary parties and the relevant issues are currently before the District Court. Further, this matter involves consideration of the Perishable Agricultural Commodities Act (7 USC § 499a et seq.), and "considerations of comity, orderly procedure, and judicial economy demand that the [f]ederal action be tried first" (*Theatre Confections v. Andrea Theatres*, 126 A.D.2d 969, 970, 511 N.Y.S.2d 744). We therefore conclude that the appeal must be dismissed without consideration of the merits. To the extent, if any, that the order appealed from is or may become inconsistent with a federal court order, plaintiff and appellant may seek relief from Supreme Court ( *see generally* CPLR 2221[a], [e]; 5015).  It is hereby ORDERED that said appeal is unanimously dismissed without costs.

*Case v. Case*, 78 A.D.3d 1610-1611, 912 N.Y.S.2d 818, 819-820 (4th Dept.  2010).

There are now four motions pending before this Court.  On March 12, 2010, after the Second Circuit reversed Judge Telesca's Order denying Dibble & Miller's motion to intervene, Dibble & Miller filed the subject motion [#29] to vacate and/or modify Judge Telesca's Stipulated Order approving the settlement in this action.  Dibble & Miller maintain that it was a mistake, approaching fraud, to treat the partnership escrow funds as PACA trust property:

> [T]he designation of the Escrow Funds as PACA assets is an error, the
> effect of which is not only to deprive Dibble & Miller of its rights in the
> Escrow Funds, but also to subvert the very purpose of PACA by extending
> the super priority lien protection intended for producers of perishable
> commodities to David Shults, a non-PACA creditor who is in fact not even a
> party to the Federal Action.

Norton Affirmation [#29] at ¶ 18.  Dibble & Miller further states that, "[t]he stipulation was a device whereby defendant, Thomas Case, preferred another creditor, and non-party, David Shults, over Dibble & Miller, thus avoiding his obligation to Dibble & Miller and protecting himself from personal liability for breach of his duty as a PACA trustee." *Id*. at ¶ 21.  Additionally, Dibble & Miller seeks an accounting, since, although the Second Circuit directed that all money that was paid out pursuant to the Stipulated Order of settlement in this action be paid to the Clerk of this Court, Dibble & Miller maintains that some money remains outstanding.  Norton Aff. [#29] at ¶ ¶ 66-67 ("Upon information and belief, the state court receiver disbursed $232,255.10 from the Escrow Funds to Mr. Levinson, which Mr. Levinson then distributed pursuant to the terms of the Stipulation.  To date, only $221,598.26 has been paid in the District Court Clerk[.]").

On September 17, 2010, Shults and Finch filed the subject motion [#61] to intervene in this action and oppose Dibble & Miller's application.  Shults and Finch indicate that there was no fraud or mistake involved in Judge Telesca's Stipulation and Order.  For example, Shults and Finch indicate that the Stipulation and Order's statement, that the escrow funds were a PACA trust asset, is not a "mistake," even if the funds are not *actually* a PACA trust asset:

> [Dibble & Miller's] argument plainly misconstrues the language of the
> Stipulation.  By its terms, the Stipulation did not constitute a judicial
> determination that the Escrow Funds were PACA assets.  Instead, the
> Stipulation characterizes the litigation positions of the [parties to the

18

stipulation].

Shults/Finch Memo of Law at 18.  Shults and Finch state that the stipulation's references

to the escrow funds as a PACA trust asset is mere "precatory language." *Id*.  In addition,

Shults and Finch state that Judge Fisher has already ruled that Dibble & Miller has no lien

on the partnership proceeds.  On this point, Shults and Finch maintain that this Court is

barred from revisiting Judge Fisher's determination, by a variety of impediments including

the *Rooker Feldman* doctrine, res judicata, and collateral estoppel.  Shults and Finch also

indicate that Dibble & Miller's lien, if any, would not attach to the proceeds of the sale of

property belonging to TNC and Buffalo 63, and that such money should be repaid to them

by the District Court Clerk.

On January 21, 2011, Lacy Katzen filed the subject motion [#67] to intervene in this

action and to receive payment of legal fees from the fund being held by the Clerk of the

Court.  Lacy Katzen argues that it should be repaid the money that it paid to the Clerk of

the Court, plus interest.  In that regard, Lacy Katzen argues that the Court should return

the legal fees that Lacy Katzen was paid, consisting of $9,096.99, plus interest, since such

money came from the proceeds of the auction of TNC's assets, not from Case's share of

the Case Brothers litigation.  Lacy Katzen therefore maintains that Dibble & Miller's motion

should have no effect Lacy Katzen's fees.

On April 15, 2011, Cambridge, Schmieding, and Bare filed the subject motion [#74]

for an order directing that all money they paid to the Clerk of the Court be returned to

them.  Cambridge, Schmieding, and Bare maintain that Dibble & Miller's motion to set

aside the Stipulation and Order should be denied as untimely.  As to their application, they

contend that motions under FRCP 60(b)(1) & (3) must be made within one year, and that

19

Dibble & Miller's motion was not made within one year of entry of the Stipulation and Order of settlement.  Cambridge, Schmieding, and Bare further contend that *all* of the Case Brothers partnership assets are PACA trust assets, and that such PACA trust was created "decades" before Dibble and Miler began representing Case in 2006. Levinson Memo of Law at p. 8.   On this point, Levinson, as attorney for Cambridge, Schmieding, and Bare, contends that a PACA trust arose during the course of the operation of the Case Brothers farming partnership, and that such trust should benefit his clients.[13]   However, Case Brothers never had dealings with Cambridge, Schmieding, or Bare.  To the contrary, Case indicates that the transactions with Cambridge, Schmieding, and Bare which are the subject of this PACA action, involved TNC, and did not occur until after long after the Case Brothers partnership was dissolved. *See*, Thomas Case Aff. ¶ 16.

On June 23, 2011, counsel for the moving parties appeared before the undersigned for oral argument of the motions.

## DISCUSSION

The Court will first consider the motions to intervene filed by Shults, Finch, and Lacy Katzen.  FRCP 24 governs motions to intervene, and provides, in pertinent part, that a person may intervene as of right, who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest." FRCP 24(a)(2).

---

[13]Levinson's argument on this point is much broader than Lacy Katzen's, since Lacy Katzen claims that the partnership assets only became a PACA trust asset after Chase used TNC money to pay Dibble & Miller in connection with the partnership litigation.  Levinson maintains that a PACA trust was created while Case Brothers was operating, and that such trust still exists, and should benefit his clients, even though they never did business with Case Brothers.  Instead, Levinson's clients only did business with TNC, a company owned by Case, a former partner in the dissolved Case Brothers partnership.

> Intervention as of right under Rule 24(a)(2) is granted when all four of the
> following conditions are met: (1) the motion is timely; (2) the applicant
> asserts an interest relating to the property or transaction that is the subject
> of the action; (3) the applicant is so situated that without intervention,
> disposition of the action may, as a practical matter, impair or impede the
> applicant's ability to protect its interest; and (4) the applicant's interest is not
> adequately represented by the other parties.

*MasterCard Intern. Inc. v. Visa Intern. Service Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir.

2006) (citation omitted). Rule 24 further provides for permissive intervention, where the

Court in its discretion may allow a person to intervene who "has a claim or defense that

shares with the main action a common question of law or fact." FRCP 24(b)(1)(B). Claims

for permissive intervention may be denied where intervention "will unduly delay or

prejudice the adjudication of the original parties' rights." FRCP(b)(3). In this case, the

Court finds that Shults, Finch, and Lacy Katzen are entitled to intervene as of right. Each

of them has an interest in the property that was paid into the District Court; disposition of

the action may impair or impede their ability to protect their interests; and, no existing party

will adequately represent their interests. Moreover, the applications were sufficiently

timely, in light of the procedural history of this action.

The Court will now consider Dibble & Miller's motion to vacate the Stipulation and

Order, pursuant to FRCP 60(b)(1),(3), and (6). Rule 60(b) states, in pertinent part, that,

> On motion and just terms, the court may relieve a party or its legal
> representative from a final judgment, order, or proceeding for the following
> reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . .(3)
> fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
> misconduct by an opposing party; . . . or (6) any other reason that justifies
> relief.

FRCP 60(b). A "mistake" under FRCP 60(b)(1) may include "the district court's own

mistake of fact." *Niederland v. Chase*, No. 10–3657–cv, 2011 WL 2023253 at *1 (2d Cir.

21

May 25, 2011) (unpublished, citation omitted).[14]  "Rule 60(b)(1)[& (3)] motions must be

made within a reasonable time not to exceed one year." *Id*. (citation and internal quotation

marks omitted).[15]

Here, the Stipulation and Order [#3] was entered because of a mistake.

Specifically, the stipulation incorrectly treats the state-court escrow funds as  "PACA trust

assets."  The Court did not learn of this mistake until it reviewed the submissions made in

connection with the pending motions, most notably the detailed affidavit of David

MacKnight, Esq.

The general legal principles applicable to PACA claims are well settled.[16]  For

purposes of this Decision and Order, it is sufficient to note that,

> [u]nder PACA, a produce dealer's proceeds from the sale of produce are
> subject to a PACA trust, which the dealer is personally responsible for
> maintaining as trustee.  The beneficiaries of the PACA trust are those
> produce suppliers from whom the produce dealer has purchased perishable
> agricultural commodities ("sellers" or "PACA creditors").  PACA thereby
> prevents produce dealers from providing non-produce-supplier creditors with
> security interests in their receivables superior to the claims of their
> produce-supplier creditors, by creating a trust for the benefit of only those
> creditors that are produce suppliers.

---

[14]*See also, In re 310 Associates*, 346 F.3d 31, 35 (2d Cir. 2003) ("We believe that the plain language of Rule 60, the advisory committee's note to the 1946 amendment, and this Court's action in Cappillino all demonstrate that a bankruptcy court has the authority to reopen a judgment based on its own mistake of fact.").

[15]Cambridge, Schmied, and Bare contend that Dibble & Miller's motion should be denied as untimely, since it was not made within a year of entry of the Stipulation and Order.  However, that argument lacks merit, since after Dibble & Miller's motion to intervene was denied, it did not have standing to bring a Rule 60(b) motion.  Dibble & Miller filed the motion to vacate on the same day that the Second Circuit's mandate was docketed.

[16]For a detailed explanation of PACA, see *American Banana Co., Inc. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d 33, 36-38 (2d Cir. 2004)

*E. Armata, Inc. v. Korea Commercial Bank of New York*, 367 F.3d 123, 125 -126 (2d Cir.

2004) (citations omitted).   "[I]ncluded in the trust as part of the sale 'proceeds' are

properties acquired with the cash proceeds of a trust property." *Atlantic Tropical Produce*

*Corp. v. El Nene Meat & Food Corp.*, No. 06 Civ. 2413(DC), 2009 WL 436050 at *5

(S.D.N.Y. Feb.s 23, 2009), *aff'd*, 356 Fed.Appx. 491 (2d Cir. Dec. 15, 2009).   PACA

imposes a "non-segregated floating trust" on  "any receivables or proceeds from the sale

of such commodities." *American Banana Co., Inc. v. Republic Nat. Bank of New York,*

*N.A.*, 362 F.3d 33, 37 (2d Cir. 2004) (quoting 7 U.S.C. § 499e(c)(2)).   Under this

arrangement, "a single PACA trust exists for the benefit of all of the sellers to a Produce

Debtor, and continues in existence until all of the outstanding beneficiaries have been paid

in full." *Atlantic Tropical Produce Corp.*, 2009 WL 436050 at *5 (internal quotation marks

omitted).  Where a PACA debtor disputes that money or property is part of a PACA trust,

he has the burden of proving that such money or property is not traceable to the PACA

creditor's produce. *Id*.   Under PACA, the commodity sellers' interests in the commodities

and sales proceeds are superior to those of the buyers' other creditors, including secured

creditors. *American Banana Co., Inc. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d at

37.

"PACA does not explicitly assign to third parties, such as banks, any responsibility

for preserving a PACA trust." *E. Armata, Inc. v. Korea Commercial Bank of New York,*  367

F.3d at 128 (citation omitted).  However, under general trust principles applicable to

PACA, a third party may be liable to PACA-trust beneficiaries, if the PACA trustee's

"transfer of funds to the third party constituted a breach of its duty as trustee to maintain

trust assets." *Id*. (citations omitted).  Additionally, to be liable, the third party transferee

"must also have had notice of the trustee's breach of trust." *Id.* at 129, n. 7; *see also,*

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 616 (2d Cir. 1998)

("[U]nder general principles of trust law, a transferee has the requisite constructive

knowledge when it 'should know' of the breach of trust.") (citation omitted).  A PACA

trustee may breach the trust in various ways, such as "dissipation," which includes "any act

or failure to act which could result in the diversion of trust assets or which could prejudice

or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in

connection with produce transactions." *E. Armata, Inc. v. Korea Commercial Bank of New*

*York,* 367 F.3d at 129.   But in any event, a third party who receives PACA trust property is

not liable to the trust beneficiaries, unless the PACA's trustee's act in giving the property

was a breach of trust, and unless the third party had notice of the breach.

Furthermore, trust principles protect bona fide purchasers from liability.  In that

regard, trust principles

> allow a bona fide purchaser to retain trust property even if the property was
> transferred in breach of trust.  To qualify as a bona fide purchaser, the
> transferee must take the property for value and without notice of breach of
> trust.  A third-party transferee may escape liability, therefore, if it: (i)
> gave value for the trust property and (ii) had no actual or constructive notice of the
> breach of trust. In establishing the protected status of bona fide purchaser,
> the burden of proof is on the transferee.

*Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d at 615 (citations omitted).

Consequently, a third-party bona fide purchaser who receives PACA trust property is not

liable to the PACA trust beneficiaries.

In this action, Case argues that his share of the settlement in the Case Brothers

litigation is a PACA trust asset, because he used TNC money to pay Dibble & Miller, which

enabled Dibble & Miller to represent him, which in turn led to the settlement of his lawsuit:

24

> But for PACA trust moneys provided as a retainer and subsequent
> disbursements paid or provided in cash by TNC, Dibble and Miller never
> would have become my attorneys in the state court case, and never would
> have contributed to the alleged generation of the settlement proceeds when
> that matter was tentatively resolved in May 2008.  Those settlement funds
> must be deemed PACA trust assets because they would not exist without
> PACA trust funds paid by TNC and me personally [to Dibble & Miller].

Thomas Case Aff., ¶ 13.  However, the Court disagrees that Case's share of the partnership is part of a PACA trust fund.  Instead, the Court finds that the escrow funds were clearly not a PACA trust asset.  At the outset, it is clear that no TNC money was included in the assets of the Case Brothers partnership.  In that regard, the partnership was dissolved before TNC was ever formed.  Moreover, no TNC money or other PACA proceeds were ever paid to Considine as Receiver or otherwise commingled with the partnership's money.  Consequently, there is no way that Considine can be deemed a transferee of TNC's PACA proceeds.  The Court is not aware of any authority supporting the argument of Case and Shults, that the partnership assets are somehow transformed into PACA trust property simply because PACA trust money was paid to an attorney involved in the litigation.

At best, Case's argument indicates that Dibble & Miller was a third-party transferee of PACA trust funds.  Consequently, there might be some argument that the PACA trust beneficiaries could recover the transferred money from Dibble & Miller.  However, even assuming that the PACA trust beneficiaries sought to recover money from Dibble & Miller, Dibble & Miller could raise defenses, such as, that it had no notice of Case's breach of trust in dissipating the trust assets, or that it was a bona fide purchaser.

25

The Court also disagrees with the arguments of Cambridge, Schmied, and Bare. As indicated above, Cambridge, Schmied, and Bare contend that the state-court escrow fund is a PACA trust asset, since the Case Brothers partnership engaged in PACA transactions.  However, there is no indication that Cambridge, Schmied, or Bare did business with Case Brothers.  Instead, the Case Brothers partnership ended before any of the transactions at issue in this case occurred.  Moreover, any PACA creditor who was owed money by Case Brothers would have been paid by Considine as part of the state-court action.  Tellingly, there is no indication that Cambridge, Schmied, or Bare made a claim for payment from the escrow funds in the Case Brothers partnership litigation.  Nevertheless, Cambridge, Schmied, and Bare, maintain that the Chase Brothers partnership escrow is a PACA trust asset, and in that regard they cite various cases, including *Sanzone-Palmisano Co. v. M. Seaman Ent., Inc.*, 986 F.2d 1010 (6th Cir. 1993), *In re Kornblum & Co., Inc.*, 81 F.3d 280 (2d Cir. 1996), and *In re Atlantic Tropical Market Corp.*, 1310 B.R. 139 (Bkrtcy. S.D.Fla. 1990). Levinson Memo of Law at 6-7.  The Court finds, though, that these cases are factually inapposite.

The Court does not need to find that the Stipulation and Order was fraudulently intended to deny Dibble & Miller its fees.  In fact, such a scenario seems unlikely.  After all, as noted above, at the time the Stipulation and Order was created, Dibble & Miller's attorney lien claim had yet to be addressed as part of the state-court litigation.[17]  If Judge Fisher had found that Dibble & Miller was entitled to a share of Case's

---

[17]According to MacKnight, he "expected that there would be substantial funds for creditors [from the state-court escrow fund] even if attorney's fees for representing Case came 'off the top' after the extent and validity of [Dibble & Miller's] allowed fees was determined by the State Court judge, no matter how much [Dibble & Miller] claimed." MacKnight Aff. p. 14, n. 6.

settlement, such amount would have been deducted from Case's share.  Instead, it appears that the decision to treat the partnership escrow fund as PACA trust money was made by Case and his attorney simply to increase the pool of money from which to satisfy potential PACA claims.[18]  The persons most likely to be harmed by such decision were Shults and Finch, not Dibble & Miller.[19]

Nonetheless, it appears that Dibble & Miller has been harmed by the mistake in treating the escrow fund as a PACA trust asset.  If nothing else, the Stipulation and Settlement, and the resulting payment of money into the District Court pursuant to the Second Circuit's order, led directly to the dismissal of Dibble & Miller's appeal to the Appellate Division, Fourth Department.  Moreover, it is unclear what effect, if any, the Stipulation and Order, and its erroneous indication that the escrow funds were subject to PACA claims,  may have had on Judge Fisher's determination concerning Dibble & Miller's application for attorney's fees.[20]   In any event, the Stipulation and Order has had the effect of impairing Dibble & Miller's ability to fully litigate its attorney's fee claim. For all of the foregoing reasons, Dibble & Miller's motion to vacate the Stipulation and Order is granted.

The motions for immediate payment, made by Lacy Katzen and Cambridge,

---

[18]The Court does not in any way suggest that Mr. MacKnight did anything wrong or fraudulent. Instead, the Court believes that he merely overestimated PACA's reach, while zealously representing his clients.

[19]At the time the Stipulation and Order was entered, if anyone was going to be harmed, it was Shults and Finch, since they were agreeing to give up a portion of their secured interest in the escrow fund, on the mistaken belief that such fund was subject to PACA claims.

[20]During oral argument, Dibble & Miller's counsel argued that Judge Fisher denied Dibble & Miller's fee application because he believed that he was bound by Judge Telesca's Stipulation and Order.

Schmieding, and Bare, from the TNC pro are denied.  These parties' entitlement to

such payment was premised on the Stipulation and Order which is now vacated.

Accordingly, at the present time there is no basis for the Court to order such payment.

CONCLUSION

Dibble & Miller's motion [#29] to vacate is granted.  Shult's and Finch's motion [#61]

to intervene is granted.  Lacy Katzen's motion [#67] is granted insofar as it seeks to

intervene in this action, but the request for payment is denied.  The motion [#74] for

payment by Cambridge, Schmied, and Bare is denied.

The Case Brothers escrow funds have nothing to do with the PACA action before

this Court.  The dispute among Case, Shults, Finch, and Dibble & Miller over the

division of the escrow fund does not involve a federal issue, and should proceed in

state court.  Accordingly, the Court will order that the money paid into this litigation by

Considine be paid over to the Clerk of the New York State Supreme Court, Livingston

County.  The remaining amounts being held by the Clerk of this Court, which apparently

are PACA trust assets, shall remain with the Clerk of this Court pending a resolution of

this action.

Within 30 days of the date of this Decision and Order, the parties shall prepare

an order for the Court's signature, directing payment of the amount received from

Considine as Receiver, plus any accrued interest, by the Clerk of this Court to the Clerk

of the New York State Supreme Court, Livingston County.

Eastern Potato's claims are dismissed, for failure to comply with Magistrate

Judge Payson's Order [#49], directing Eastern Potato to retain new counsel, after

Levinson was relieved as counsel.[21]  The Clerk of the Court is directed to terminate

Eastern Potato from this action.

        IT IS SO ORDERED.

Dated:        Rochester, New York
              July 6, 2011

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge

---

[21]*See*, footnote 8 above.